# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

In re:

UNITED AMERICAN, INC.,

   Debtor.

Case No. 05-11507-RGM
(Chapter 11)

## MEMORANDUM OPINION

THIS CASE is before the court on the debtor's motion to pay the pre-petition claims of R&B Grove Cabinetry, Inc., ("Grove") and Truland Service Corporation ("Truland"). The motion was filed six weeks after the chapter 11 case was commenced. No plan of reorganization has been filed. The motion asserts that the two vendors are essential for the debtor's continued operation and successful reorganization. It asserts that this court has the authority to authorize payment under the equitable Doctrine of Necessity. After an evidentiary hearing, the court denied the motion as to Grove, and granted it as to Truland, not on the basis of the Doctrine of Necessity, but as an assumption of an executory contract.

## Background

United American, Inc., the chapter 11 debtor-in-possession, is a contractor engaged in commercial and residential property construction projects. The construction project in question is a commercial project to build out space the owner, Oracle Corporation, leased to the Federal Air Marshal Services ("FAMS"). The debtor in turn subcontracted various portions of the job. The two subcontracts involved in this motion are with Truland, the electrical subcontractor, and Grove, a cabinet supplier.

1

Oracle paid the debtor $499,005.00 and owes an additional $282,122.00 for work completed. An additional $37,000.00 can be billed under the contract. In order to complete the contract, it will cost about $216,635.00 leaving a net profit of about $102,485.00. This net profit assumes that Truland is paid $48,564.00 for its pre-petition claim and that Grove is paid $30,036.42 for its pre-petition claim.[1] The cash flow analysis does not take into account some subcontractors' ability to file mechanics' liens. For other subcontractors, the time within which mechanic's liens may be filed has expired. From the evidence presented, it appears that Truland may still file a mechanic's lien for its unpaid pre-petition claim, but the time within which Grove may file a mechanic's lien for its pre-petition claim has expired unless Grove supplies additional cabinets or performs additional work on the project. *See* Code of Virginia (1950) §43-3. Only about $17,000.00 of the remaining pre-petition claims may still be enforced by filing mechanic's liens.

The project is almost completed. Oracle is withholding payment of the amount it owes the debtor. All work stopped because of the debtor's inability to pay its subcontractors. Occupancy was to be given to FAMS on May 31, 2005.

Truland is able to complete the work under its subcontract within two weeks once it resumes work. Its pre-petition claim is $48,564.00. The value of its work yet to be completed is $15,386.00. A substitute electrician could be obtained; however, there are difficulties in substituting a new electrician. Truland prepared shop drawings of the work that it contracted to perform. The shop drawings have been approved by the appropriate county agencies. There is some question as to the ownership of the shop drawings, that is, whether they are owned by Truland or the debtor. If they

---

[1] The term "net profit" is misleading because there are other subcontractors with outstanding pre-petition claims that are not anticipated to be paid from proceeds. Rather than being "net profit", the resulting proceeds are more accurately described as "available cash flow."

are owned by Truland, a substitute electrician would not be able to use them. It would have to prepare its own shop drawings and obtain county approval. If Truland does not complete its work, it will not guarantee the work that it has performed. To obtain a warranty from a substitute electrician for the work performed requires additional effort and cost to inspect the work Truland completed. It may take as much as eight weeks for the debtor to obtain a substitute electrician, approval of new shop drawings, and complete the work.

One of the chief impediments to obtaining a substitute electrician is the permit issued by the county. The county will only issue one electrical permit at a time on any job. If Truland does not voluntarily surrender its permit, the county is unlikely to revoke the permit. It does not want to become embroiled in a dispute between the electrician and the debtor. When an electrician refuses to surrender a permit, it is virtually impossible to obtain a new permit and, consequently, a subsequent electrician. Each electrician obtains his own permit and is responsible to the county for the work performed under his permit.

Grove manufactured and installed most of the cabinetry required. The FMAS project manager testified that the only cabinets not installed are those to be installed in a photocopy room. He testified that as long as they substantially conform to the plans, FMAS would be satisfied. The cabinets, he opined, did not need to be specially manufactured to comply with the requirements. The undelivered cabinets had not been manufactured by Grove as of the date of the hearing. Grove has the raw materials from which the cabinets can be made in stock but has not cut the materials or assembled the cabinets. The raw materials can be used to build cabinets for other customers. Grove's representative testified that it would not supply the rest of the cabinets unless its pre-petition claim was paid. He testified that there is a single subcontract for all of the cabinet work to be

performed. Grove's pre-petition claim is $30,036.42. The balance to be paid on the contract is $15,391.63.

### Doctrine of Necessity

There is much discussion about the extent of the Doctrine of Necessity. *See, e.g., Kmart Corp.,* 359 F.3d 866 (7th Cir., 2004). The Doctrine of Necessity is an equitable doctrine that endeavors to reconcile two otherwise irreconcilable objectives of chapter 11: the reorganization of otherwise viable entities that have fallen upon hard times into profitable entities and thereby pay pre-petition creditors and preserve jobs; and, at the same time, the equal treatment of all creditors. Pre-confirmation payment of select non-priority unsecured creditors violates the equal treatment principle. *Official Comm. of Equity Security Holders v. Mabey,* 832 F.2d 299, 302 (4th Cir., 1987). ("The Bankruptcy Code does not permit a distribution to unsecured creditors in a Chapter 11 proceeding except under and pursuant to a Plan of Reorganization that has been properly presented and approved").

These two principles are reflected in the automatic stay and the avoidance of preferences. These provisions prevent the piecemeal dismemberment of an entity seeking to reorganize, enhance the likelihood of a successful reorganization and preserve the equal treatment of unsecured creditors. Pre-confirmation payment of select pre-petition unsecured claims "violates the clear policy of Chapter 11 reorganizations". *Mabey,* 832 F.2d at 302. It permits the piecemeal dismemberment of the debtor to the potential detriment of the reorganization effort and other unsecured creditors. Indeed, the requirements for confirmation of a plan in §1129 preclude unfair discrimination against

creditors and generally preclude immediate full payment of some pre-petition unsecured creditors while providing for only partial payment over time to others.

The policy of equal treatment of creditors does not trump freedom of contract. Absent a contractual agreement, there is no obligation to deal with another party, whether a party in bankruptcy or not. Without a contract, suppliers can refrain from dealing with a debtor. Frequently, the decision to do so is based more on the uncertainty of payment for post-petition goods and services. A problem arises when the theory of equal treatment meets the reality that, from time to time, certain suppliers are essential to the continued viability of a business and a debtor's ability to reorganize. If the suppliers legitimately decline to have further dealings with the debtor, the reorganization effort will come to an end before it has had an opportunity to begin. In this instance, it is impossible to reconcile the objectives of encouraging reorganizations and assuring the equal treatment of creditors. To insist upon the latter necessarily precludes the former. The Doctrine of Necessity is an attempt to reconcile these principles in these narrow circumstances. The remedy, payment of select pre-petition unsecured claims, flies in the face of all of the notions of equal treatment of creditors. It is, however, a necessary deviation because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its pre-petition claim.

The Doctrine of Necessity can be easily abused. *Kmart Corp.* reflects the extent to which a narrowly constructed remedy became over time a routine appeasement of creditors. If there is to be a Doctrine of Necessity, it must be narrowly construed and sparingly applied.

Three tests for the application of the Doctrine of Necessity have developed which, if applied, retain the narrowness and the exceptional quality of the Doctrine: (1) the vendor must be necessary for the successful reorganization of the debtor; ( 2) the transaction must be in the sound business

judgment of the debtor; and (3) the favorable treatment of the critical vendor must not prejudice other unsecured creditors.

  1. <u>Necessity</u>. The necessity prong was addressed in this court in *In re NVRLP*, 147 B.R. 126 (Bankr. E.D.Va. 1992). Judge Tice wrote:

> To justify the pre-plan payment of a pre-petition obligation, the proponent of the payment must show substantial necessity. By definition, the 'necessity of payment' rule is a rule of necessity and not one of convenience. For example, some courts have stated the payment be 'critical to the debtor's reorganization' (*In re Financial News Network, Inc.*, 134 B.R. 732, 736 (Bankr.S.D.N.Y. 1991)), 'indispensably necessary' to continuing the debtors' operation (*In re Boston and Maine Corp.,* 634 F. 2d 1359, 1382 (1st Cir. 1980), or 'necessary to avert a serious threat to the Chapter 11 process' (*In re Eagle-Picher Industries, Inc.*, 124 B.R. 1021, 1023 (Bankr.S.D. Ohio 1991). In short, the payment must not only be in the best interest of the debtor but also in the best interest of its other creditors. *See In re UNR Industries, Inc.,* 143 B.R. 506, 520 (Bankr.N.D.Ill. 1992); Eisenberg & Gecker, *The Doctrine of Necessity and Its Parameters,* 73 Marq.L.Rev. 1, 20 (1989). Accordingly, NVR must articulate a compelling business justification, other than mere appeasement of a major creditor for making the proposed payment to [the creditor]. *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175.

*Id.* at 128.

  The necessity prong was articulated in a slightly different fashion in *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D.Tex 2000):

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks a probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

  These two cases underline the strictness of the necessity prong of the Doctrine of Necessity. There are two aspects to necessity. Necessity requires that there be no alternative. There must be no substitute vendor available even at a greater expense. Alternative means of obtaining the

vendor's cooperation in supplying his goods or services must be exhausted. There must be no other "practical or legal alternative" with which the debtor can deal with the claimant. This means that the vendors' goods or services are essential and that the critical vendor will, in fact, not provide them without exceptional treatment. Both require an evidentiary basis. The essential nature of the goods or services is a relatively straight-forward factual matter. The critical vendor's stated intent not to provide his goods or services in the future is not as straight-forward. It requires a determination of his intent with respect to a prospective future action or inaction. His mere statement that he will not supply the goods or services is rarely sufficient. Anyone can *say* that. The real question is whether he *means* it, that is, his *actual* intent.[2]

In this case, Grove is not necessary by any definition of the term. Its product is fungible and readily available. The cabinetry can be ordered from many manufacturers which have many different styles and sizes in stock. To the extent that specially manufactured cabinetry is necessary because of size or style, other manufacturers are readily available. Grove has not begun construction of the remaining cabinets so if a special order is necessary, there will be no undue delay. Substitution of a new supplier is clearly available without any significant delay.

Truland, the electrician, makes a much better case for necessity. It holds a permit which according to an expert witness is virtually impossible to replace without the electrician's voluntary surrender of the permit. This argument does not impress the court. If Truland does not intend to use

---

[2] For example, in *NVRLP,* the court found that the critical vendor – a former employee who was currently a well-compensated consultant of the debtor – would not, despite his protestations, refuse to continue to work for the debtor if the motion were denied. The court found that it was not in the former employee's interest to "walk away" from lucrative consulting fees "in protest of not receiving immediate super priority payment of his bonus". *Id.* at 128. It concluded that "the hypothetical threat" posed by the former employee dishonoring his non-solicitation agreement was too remote and speculative. Payment was not necessary to obtain the services the debtor needed.

the permit to finish construction on the project and retains the permit solely to effect collection of a pre-petition debt, it is in violation of §362 of the Bankruptcy Code. In those circumstances, the court would not hesitate to order Truland to surrender the permit so that the county could immediately re-issue a permit to the electrician of the debtor's choice.

Additional considerations reflect the importance of continuing to utilize Truland. A successor electrician would have to undertake significant work to determine the quality of the prior work before it would undertake the guarantee the work performed by Truland. There are questions about the ownership of the shop drawings. If they are owned by Truland, Truland has no obligation to deliver them absent payment and a substitute electrician would have to produce new shop drawings. While this is possible, it would occasion delay and expense. The expert witness raised a question as to whether any other electrician would, in this small closely-knit fraternity, undertake to succeed Truland. The evidence, however, is not convincing that there are none who would undertake this job. The debtor presented no evidence to show it had made any effort to find a replacement electrician and was unable to do so. Overall, the court is convinced of the importance of retaining Truland as the electrician for the job, but is unconvinced that Truland is critical. Replacing Truland would cause delay and additional expense, perhaps significant expense, but the evidence is insufficient to show that no replacement could be reasonably obtained.

Having determined that Grove's and Truland's services are not necessary, it is not necessary to determine their actual intent.

2. <u>Business Judgment</u>. The second prong of the Doctrine of Necessity is the sound business judgment of the debtor.[3] Even if a vendor is critical to the success of the debtor, the court cannot

---

[3]The debtor must satisfy all three prongs, not just a majority. Having failed to satisfy the first prong, consideration of the second and third prongs is not strictly necessary.

allow the position to be abused. Critical vendor status must take into account the rights of all of the creditors of the estate and the remedy must be crafted to the circumstances of the case. It should provide an adequate and complete remedy, but not a windfall. For example, in *CoServ*, the critical vendor was allowed a payment of 77.5% of its pre-petition claim.[4] Part of a complete remedy must assure the debtor of the vendor's future performance. There must be an obligation on the part of the critical vendor to provide future supplies and services. He may not accept the pre-petition payment and then terminate an at-will relationship. In this case, the debtor showed sound business judgment to treat Truland as a critical vendor, but not Grove. Grove does not satisfy this test principally because the amount necessary to obtain full performance from Grove far exceeds the costs of substitute performance from another vendor. Truland does not satisfy this test because the proposed treatment does not provide for a binding obligation on the part of Truland to complete its contract.

      3. <u>Prejudice to other creditors</u>. The third prong of the Doctrine of Necessity is the absence of prejudice to other creditors. The application of the Doctrine of Necessity offends the principal of equal treatment of creditors less when the other creditors of the estate are not prejudiced – and may be benefitted – by its application. If the first two prongs were satisfied in this case, satisfaction of the third prong as to Truland would follow. If Truland were critical to the successful completion of the contract with Oracle, the failure of Truland to perform would result in a breach of the contract

---

[4] The second prong of the *CoServ* test, "the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value which is disproportionate to the amount of claimant's pre-petition claim", is not properly part of the necessity prong. Necessity is not simply an increased cost or a lessened prospective profit or a heightened or lessened economic advantage. Necessity means critical and essential, that is, without this vendor, the debtor cannot reorganize. The risks and probability of significant harm or significant loss of economic advantage relate more to the sound business judgment prong, not the necessity prong of the Doctrine of Necessity. While such matters may be evidence that the debtor is unable to reorganize without the vendor, the factual finding must be that the reorganization is possible but for the vendor, not that the prospective reorganization would be more difficult or less successful.

that the debtor could not cure. The breach damages would likely be set off against or recouped from the amounts presently due to the debtor from Oracle. Oracle's damage claim would likely exceed the amount requested to be paid to Truland for its pre-petition claim. Creditors would be hurt more by the debtor's failure to complete the Oracle contract than by the payment of the pre-petition claim to Truland. The same is not true for Grove. The cost to complete the Grove contract, including paying the pre-petition claim, exceeds the cost of substitute performance.

The debtor failed to satisfy the three prongs of the Doctrine of Necessity. While the Doctrine of Necessity does not support the debtor's motion, there are two additional bases that must be considered before the requested relief can be granted or denied.

## **Potential Mechanics' Liens**

The first alternative ground for relief arises under Title 43 of the Code of Virginia (1950), Mechanics' and Materialmen's Liens. Section 43-3 provides that those performing labor or furnishing materials for the construction, removal, repair or improvement of any building or structure permanently annexed to a freehold will have a lien, if timely perfected, upon the real estate. For commercial properties, such as is in issue in this case, a memorandum of lien must be filed not later than "ninety days from the last day of the month in which [the lienor] last performs labor or furnishes material, and in no event later than ninety days from the time such building, structure, or railroad is completed or the work thereon otherwise terminated."

In Virginia, the filing of a mechanics' lien is not stayed by the automatic stay imposed by §362 of the Bankruptcy Code. Section 362(b)(3) provides that the automatic stay does not stay any action to perfect an interest in property "to the extent that the trustee's rights and powers are subject

to such perfection under section 546(b)." Section 546(b)(1) subjects the trustee's powers under §§544, 545, and 549 to "any applicable law" that permits "perfection of an interest in property to be effective against an entity that acquires rights and such property before the date of perfection." Section 43-21 of the Code of Virginia (1950) provides just that. A mechanic's lien has priority over all other liens on the property. In fact, if proper notice is given to Oracle, Oracle as the owner would be jointly liable for the amount of the lien to the extent it is obligated to the debtor. Code of Va. (1950) §43-11.

It appears from the evidence that Truland can perfect a mechanics' lien without violating the automatic stay and thereby become a secured creditor. Ultimately, the amount requested to be paid to Truland would be paid to Truland as a secured creditor in accordance with the provisions of the Bankruptcy Code.

It would not be improper in these circumstances to authorize payment to Truland as a secured creditor at this time and not require Truland to complete all of the formalities of properly filing a mechanic's lien and giving notice to Oracle. Such actions consume time and money, and if done properly would ultimately result in payment. The actions are essentially formalities. Other creditors would be benefitted by requiring them only if Truland did not follow all of the procedures required by the mechanics' lien statute and did not perfect an enforceable mechanic's lien. The court could assume that Truland would accomplish them and treat them as mere formalities if the debtor were afforded full relief. Without a binding obligation on the part of Truland to complete the contract, the court will not make that assumption. Without a validly perfected mechanic's lien, the court should not grant the debtor's motion at this time on this ground.

The evidence presented shows that the time within which Grove can file a mechanics' lien has expired. Consequently, the same arguments presented in favor of Truland do not apply to Grove.

## Executory Contract

The debtor's motion to pay Truland will be granted because Truland has an executory contract that the debtor may assume under §365 of the Bankruptcy Code. The debtor's real objective is to have Truland complete its contract. That contract is an executory contract. Both parties have obligations under the contract that have not been fully performed. Truland has not completed its electrical work. The debtor has not completed payment for the work. The failure of either to honor its obligations would result in a breach of the contract. This is the essence of the definition of an executory contract. *See* 3 Collier on Bankruptcy ¶365.02[1] 15th ed. (2005).

In order to assume an executory contract, the debtor must cure or provide adequate assurance that it will promptly cure its default. Its default is the failure to pay the pre-petition claim in accordance with the contract. The debtor must also give assurances of future performance. In this case both are satisfied by Oracle's representation that it will promptly pay all further invoices upon completion of all of the work.

The debtor enunciated a sound business judgment for assuming Truland's contract. The assumption is in the best interests of the debtor and the estate. It furthers the reorganization efforts of the debtor. It minimizes the claims against the debtor. It will result in a positive net cash flow to the debtor which can be used to pay creditors if the debtor liquidates or to operate if it reorganizes.

Grove also has an executory contract. However, the court will not approve assumption of it. Assumption of the Grove contract requires a substantial cure payment. The cure payment far exceeds the cost of obtaining substitute performance. It is, therefore, not in the best interest of the debtor or the other creditors to assume the contract.

## **Conclusion**

The court will approve the debtor's assumption of the Truland electrical contract and approve payment of its pre-petition claim as a part of the requirement to cure its defaults under the assumed contract. The motion will not be granted under the Doctrine of Necessity or as payment of a potential mechanic's lien. The motion will be denied as to Grove.

Alexandria, Virginia
July 13, 2005

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copies electronically to:

Thomas P. Gorman
Frank J. Bove
Matthew Marc Moore
Joseph P. Corish

Copies mailed to:

Michael J. Lichtenstein
Shulman, Rogers, Gandal,
 Pordy & Ecker, P.A.
11921 Rockville Pike, Suite 300
Rockville, Maryland 20852-2743

Steven O. Gasser
Shartsis Friese LLP
One Maritime Plaza, 18th Floor
San Francisco, California 94111

John J. Matteo
Jackson & Campbell, P.C.
1120 - 20th Street, NW
South Tower
Washington, D.C. 20036

Todd A. Beck
Chairman of the Committee
 of Unsecured Creditors
8039 Laurel Lakes Court
Laurel, Maryland 20707

Jane S. Dudley
Whiteford, Taylor & Preston, LLP
1025 Connecticut Avenue, NW
Washington, D.C. 20036-5405

Turkessa B. Rollins
Fullerton & Knowles
12644 Chapel Road, Suite 206
Clifton, Virginia 20124

Edward W. Cameron
Odin, Feldman & Pittleman, P.C.
9302 Lee Highway, Suite 1100
Fairfax, Virginia 22031

Richard M. Sissman
1485 Chain Bridge Road, Suite 105
McLean, Virginia 22101

12242